# REDACTED OPINION

# In the United States Court of Federal Claims

**No. 18-1C**
**Filed: February 23, 2018**
**Redacted Version Issued for Publication: March 19, 2018[1]**

```
* * * * * * * * * * * * *   *
```
IAN, EVAN & ALEXANDER          *
CORPORATION,                   *          **Bid Protest; Request for Injunctive**
                               *          **Relief; Cross-Motions for**
      **Protestor,**    *          **Judgment on the Administrative**
  **v.**                       *          **Record; Motion to Dismiss;**
                               *          **Competition in Contracting Act;**
UNITED STATES,                 *          **Out-of-Scope Modification**
                               *
      **Defendant,**    *
                               *
  **v.**                       *
                               *
XCELERATE SOLUTIONS,           *
                               *
      **Defendant-Intervenor.**    *
                               *
```
* * * * * * * * * * * * *   *
```

    **John R. Prairie**, Wiley Rein LLP, Washington, D.C., for protestor.  Of counsel were **Brian G. Walsh**, **Kendra P. Norwood**, and **Cara L. Lasley**, Wiley Rein LLP, Washington, D.C.

    **Douglas T. Hoffman**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him were **Franklin E. White, Jr.**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A, Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice.

    **Michelle E. Litteken**, PilieroMazza PLLC, Washington, D.C., for defendant-intervenor. Of counsel were **Jonathan T. Williams**, **Samuel Finnerty**, **Meghan F. Leemon**, PilieroMazza PLLC, Washington, D.C.

---

[1] This opinion was issued under seal on February 23, 2018. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]." The court made additional conforming redactions for consistency.

**O P I N I O N**

**HORN, J.**

In the above-captioned bid protest, protestor Ian, Evan & Alexander Corporation (IEA) asserts that the Defense Security Services (DSS) violated the Competition in Contracting Act (CICA) when the DSS issued an allegedly out-of-scope modification to a contract it held with Celerity Government Solutions LLC, doing business as Xcelerate Solutions (Xcelerate Solutions).

**FINDINGS OF FACT**

On October 28, 2013, the Department of Defense (DoD) Washington Headquarter Services (WHS), a separate organization within the DoD, had awarded IEA Contract No. HQ0034-14-A-0004, which, according to the parties' Joint Stipulation of Facts, was one of five awards made under "a small business set-aside blanket purchase agreement ('BPA') known as Technical, Analytical Administrative and Security ('TAAS')." The BPA between the WHS and IEA had an ordering period of October 28, 2013 through August 14, 2018. The BPA stated that IEA "shall provide a variety of professional, technical, analytical and administrative services to assist the Office of the Under Secretary of Defense (Intelligence) (OUSD(I)) in the areas of world-wide counterintelligence, security, intelligence, surveillance and reconnaissance (ISR) missions." The "principal user of the BPAs" was OUSD(I), although "other customers supported by Washington Headquarters Services, Acquisition Directorate may use the BPA with the consent of the Contracting Officer." As discussed below, IEA was awarded a task order that expired on January 22, 2018 under its BPA with the WHS.

The parties state in their Joint Stipulation of Facts that, following the September 2013 shooting at the Washington Navy Yard, the Secretary of Defense directed concurrent internal and independent reviews of the DoD's programs, policies, and procedures regarding the granting and renewing of security clearances for DoD personnel and contractor personnel. In March 2014, based on the findings and recommendations of the DoD's internal and independent reviews, the Secretary of Defense identified "four key recommendations," one of which was to implement Continuous Evaluation (CE) of personnel with access to DoD facilities or classified information. Additionally, DoD Instruction No. 5200.02, which was also issued in March 2014, states that "[a]ll personnel in national security positions shall be subject to continuous evaluation." See Dep't of Def. Instruction, No. 5200.02, at 11 (Mar. 21, 2014). In their Joint Stipulation of Facts, the parties state:

> Continuous evaluation, or CE, is a vetting process to review the background of an individual who has been determined to be eligible for access to classified information or to hold a sensitive position at any time during the period of eligibility. CE is intended to fill the gap that exists between periodic reinvestigations in which issues relevant to an individual's continued eligibility for a security clearance may go unreported or unknown. For example, while the Federal Investigative Standards have allowed for

periodic reinvestigations to be conducted at any time following the completion of the previous investigation or reinvestigation, agencies have not been required to conduct them more frequently than every five years, at most, depending on the clearance level and investigative standards in effect. Like periodic reinvestigations, the purpose of CE is to assist agencies in evaluating an individual's continued eligibility for access to classified information.

CE involves automated record checks conducted on a more frequent basis, whereas periodic reinvestigations are conducted less frequently and may include, among other things, subject and reference interviews. The types of records checked as part of CE are the same as those checked for other personnel security purposes. Security-relevant information discovered in the course of CE is to be investigated and adjudicated under the existing standards.

In October 2014, the DoD initiated a CE pilot program that was to be conducted in a phased approach, with the number of individuals enrolled in the DoD's CE pilot program to increase over time. Initially, the DoD's CE pilot program included approximately [redacted] military, civilian, and contractor security clearance holders. DoD expanded the number of security clearance holders enrolled in the CE pilot program to approximately [redacted] in December 2015, approximately [redacted] in December 2016, and approximately [redacted] in September 2017.

On September 22, 2015, WHS awarded IEA Order No. 08 under Contract No. HQ-0034-14-A-0004 (IEA's Task Order), which was titled "DoD Continuous Evaluation Validation Cell." IEA's Task Order was a firm-fixed-price task order and had a total value of approximately $16.8 million.[2] IEA's Task Order had an initial period of performance from September 23, 2015 to September 22, 2016, and contained four one-year option periods. Under IEA's Task Order, IEA was to

[o]btain a knowledge-based analytic capability to validate alerts generated by the DoD Continuous Evaluation (CE) Program. The validation cell will use supporting systems to receive and determine the CE results meet established reporting criteria before forwarding adjudicatively-relevant and actionable information to the DoD Consolidated Adjudication Facility (DoD CAF) and DoD Component security officials, as appropriate.

IEA's Task Order's performance work statement stated that the DoD "is evolving its CE program as directed by the Secretary of Defense's February 21, 2014 memorandum," and that IEA "shall provide the personnel necessary to support the accurate and timely validation CE flags as the program scales." IEA's Task Order's performance work statement also provided that IEA's "[e]fforts included, but are not

---

[2] IEA was awarded other orders under Contract No. HQ-0034-14-A-0004, however, Order No. 08 is the one relevant to the above-captioned bid protest.

limited to, developing processes and procedures, assessing and validating flags generated by the DoD CE capability, developing business rules, drafting research reports, collecting metrics, and developing future CE requirements."

Additionally, Section C-2 of IEA's Task Order, titled "PERFORMANCE REQUIREMENTS (TASKS)," listed the following "Performance Objectives and Performance Elements" for IEA's Task Order:

- Receive, evaluate, and disseminate flags from the DoD CE capability in accordance with DoD established policy, guidelines, and procedures.

- Assess and validate CE flags using available data sources to attribute the information to a specific subject and determine if the information is relevant and actionable, in accordance with DoD established guidelines and procedures.

- Disseminate CE results and related correspondence to personnel security specialists, CI, insider threat (InT), and/or law enforcement (LE) personnel, as applicable, and within DoD established guidelines.

- Develop tracking tools, matrices, and templates to efficiently analyze data and produce metrics which identify trends, referral status, and business rules efficiency.

- Support the DoD CE Program as required, including policy development, comment adjudication, formal coordination, and resource assessments. Provide logistical, data gathering, and presentation support to meet OUSD(I) and DoD CE Program requirements. Continually monitor and review CE processes and procedures to inform the government where efficiencies can be realized.

- Provide feedback to the DoD CE Program regarding the relevance and validity of the business rules for flags. Policies, procedures and strategies will be planned and integrated into the CE program as needed. Support the development and delivery of CE-related reports, briefings, and training as needed.

- Assist with the agenda setting and facilitation of the DoD Personnel Security IT Governance Board, DoD CE Functional Working Group, and other CE-related forums as required.

- Provide administrative support as necessary, to include planning meetings, tracking action items, and preparing read-ahead briefing material, meeting minutes, formal correspondence packages, activity reports, senior leadership reports, and travel/training/personnel documents.

- Complete online mandatory training modules, as identified by the COR [Contracting Officer Representative], prior to rendering any alert dispositions.

(capitalization in original). According to IEA's motion for judgment on the Administrative Record in the above-captioned bid protest, a "DoD CE Automated System" would automatically flag records and send those records to IEA. IEA alleges that it would evaluate and validate the records flagged by the DoD CE Automated System. IEA states that it would then send the validated flagged records to the "PSMO-I [Personnel Security Management Office for Industry] contractor," who would assign the validated flagged records a "risk priority."

IEA's Task Order estimated that IEA would need to provide twelve full-time equivalent personnel security analysts during IEA's Task Order's base period of performance and indicated that the number of full-time equivalent personnel security analysts working under the Task Order would increase during the options periods as the DoD CE program scaled. During the base period of performance of IEA's Task Order, the WHS paid IEA approximately $1.5 million for its performance.

On June 24, 2016, the DSS, not WHS, which had awarded IEA's previous task orders, issued Solicitation No. HS0021-16-R-0001 (the Solicitation), which was set-aside for small businesses. The Solicitation was a negotiated procurement that sought contractor support for the Personnel Security Management Office for Industry (PSMO-I) within the DSS. Section 1.2 of the Solicitation, titled "Background," provided the following information regarding the procurement:

PSMO-I: On May 3, 2012, the Deputy Secretary of Defense directed complete consolidation of the functions, resources, and assets of seven of the Department's distinct Component Central Adjudication Facilities (CAFs), including DSS' Defense Industrial Security Clearance Office for Industry (DISCO), under the authority, direction and control of the Director for Administration and Management effective October 21, 2012. Due to the DSS responsibility for the administration and implementation of the National Industrial Security Program (NISP) on behalf of the Secretary of Defense and other government agencies, some DSS personnel were exempt from CAF consolidation and remained with the DSS. The specific functions performed by these personnel include personnel security management and statistical analysis/planning for cleared Industry executed by the newly established PSMO-I in October 2012.

Continuous Evaluation and Defense Insider Threat Management and Analysis Center: On September 19, 2014, the Deputy Secretary of Defense approved the Washington Navy Yard Implementation Plan to implement the March 18, 2014 key recommendations following the tragic shooting at the Washington Navy Yard on September 16, 2013. The Department of Defense (DoD) was directed to: 1) Implement Continuous Evaluation (CE)

of personnel with access to DoD facilities or classified information; and 2) Establish the Defense Insider Threat Management and Analysis Center (DITMAC) to assess, recommend intervention or mitigation, oversee case action on threats that insiders may pose to their colleagues and/or DoD missions and resources, and to fulfill certain requirements of the national insider threat policy and minimum standards. Processing information pertaining to cleared Industry from CE and DITMAC will be a new mission for DSS and PSMO-I effective FY15.

Section 1.3 of the DSS Solicitation, titled "Objectives," stated that the Solicitation's "PWS [performance work statement] provides continuous Personnel Security Operational Support to review and process personnel security documentation as it relates to the NISP [National Industrial Security Program]." Section 1.4 of the Solicitation, titled "Scope," provided that the awardee "shall be responsible for providing operational support to assist in the personnel clearance oversight and management as prescribed by the DoD Personnel Security Program, Industrial Security Program and National Industrial Security Program Operating Manual (NISPOM) in support of National Security, DoD Readiness and Military Operations."

Part 5 of the DSS Solicitation identified the following "Specific Tasks" to be performed under the resulting contract:

5.1. <u>Basic Services</u>: The Vendor shall support duties and processing requests to include OPM [United States Office of Personnel Management (OPM)] Unacceptable Notifications, OPM Discontinue Notifications, OPM Separation/Transfer, OPM Catch'em in CONUS [continental United States (CONUS)], DOHA [Defense Office of Hearing and Appeals (DOHA)] Reapplications, Personal Identification Data Changes, Record and Data Management, Process SF-312s Non-Disclosure Agreements, Processing of Incident Reports, e-QIP [electronic questionnaires for investigations processing (e-QIP)] Review, Triage Outreach Program, Personnel Clearance (PCL) Oversight Functions and other evolving initiatives as related to Continuous Evaluation and the Defense Insider Threat Management Analysis Center. Vendor support shall perform functions and analysis to facilitate personnel security clearance tasks as described throughout Section 5.

5.2 <u>Unacceptable Notification</u>: Unacceptable notifications are received from the OPM when an investigation request is not complete or does meet [sic] the timeline for submission. Once the case becomes Unacceptable, Vendor personnel updates the subject's eligibility in accordance with Standard Operating Procedures.

5.3 <u>Discontinue Notifications</u>: Vendor personnel will receive Discontinued Notifications from OPM via system notifications and in the mail. The Vendor

shall process Discontinue Notices in accordance with Standard Operating Procedures.

5.4   Separation/Transfer Notifications:   Vendor personnel receive Separation/Transfer notifications via system notifications from the system(s) of record. The Vendor shall process Separation/Transfer Notifications in accordance with Standard Operating Procedures.

5.5 Catch 'em [sic] in CONUS: Vendor personnel shall process information received from FSO's [facility security officer (FSO)] regarding a subject's dates of availability for a CONUS interview with OPM. Once the information is received, the Vendor personnel shall notify OPM's Catch 'em [sic] In CONUS Team for scheduling of the subject interview.

5.6 Defense Office of Hearing and Appeals (DOHA) Reapplication: Vendor personnel process the e-QIPs as received by government personnel for individuals whose security clearance was Denied or Revoked by DOHA. Vendor personnel prepare a package consisting of the e-QIP and signature pages to PSMO-I management for further processing. Vendor personnel notify DOHA of the subject's reapplication and of the subject's intent to reapply for a security clearance.

5.7   Personal Identification Data Changes:   Vendor personnel are responsible for correcting Personal Identification Data (PID) changes upon request from FSO's or submitting a request for the correction, to the appropriate database owner.

5.8 Record and Data Management: Vendor personnel create and modify records in personnel security databases; add, delete, and create documents for workflow process and assignment. Vendor personnel receive, distribute and send mail.

5.9   Process Standard Form-312:   Vendor personnel shall review all submitted Classified Information Non-Disclosure Agreements (SF-312) for completeness and separate forms as either acceptable or rejected in order to process acceptable SF-312's into designated database and process rejected messages to FSO via the system(s) of record.

5.10 Incident Reports: Vendor personnel will review, analyze, and distribute all Incident Reports sent to PSMO-I in accordance with DSS/DoD CAF CONOPS [Consolidated Adjudications Facility Concept of Operations (CAF CONOPS)]. The analysis will consist of ranking reports into three categories: Low, Medium, and High. Vendor personnel will upload the Incident Reports into CATS [Case Adjudication Tracking System (CATS)] and determine the severity and risk of the Incident Report. Low Incident Reports will be forwarded to PSMO-I government personnel to close in

system(s) of record. Medium Incident Reports will be forwarded by Vendor personnel to the DoD CAF [Department of Defense Consolidated Adjudications Facility (DoD CAF)] for adjudicative action. High Incident Reports will be forwarded to the PSMO-I Interim Suspension personnel and the DoD CAF for immediate action.

5.11  Electronic Questionnaires for Investigations Processing (e-QIP) Review: Vendor personnel shall review initial investigation submissions for completeness and route to government personnel for final approval and release to OPM.

5.12 Triage Outreach Program (TOP): Vendor personnel shall perform TOP activities for approximately 5,000 NISP [National Industrial Security Program (NISP)] facilities annually. TOP activities include: research of security involvement in the NISP, company website information, JPAS [Joint Personnel Adjudication System (JPAS)] activity and PCLs [personnel security clearance (PCL)], federal and state business records, transmit and suspense TOP survey to FSO via automated SharePoint workflow, evaluate and document TOP survey responses against established NISPOM [National Industrial Security Program Operating Manual (NIPSOM)] criteria, conduct telephonic follow-up with the FSO to correct security relevant issues and ambiguous TOP survey responses, and transmission of facility security posture to assigned Industrial Security Representative via automated SharePoint workflow.

5.13 Personnel Clearance (PCL) Oversight Functions: Vendor personnel shall perform research on overdue periodic reinvestigation and aging interim clearance population and take authorized actions as directed by PSMO-I. This research includes but not limited to checking the status of the open and closed investigations, submitting requests for information and expanded focus investigations and enhanced subject interviews. Vendor personnel will assist with additional pending adjudication actions as required.

5.14 Customer Service Requests: Vendor personnel will review, process and respond to customer service requests for issue resolution action. The customer service request may be in the form of an e-mail, phone call, fax, system(s) of record, or other mode of communication.

5.15 DSS Knowledge Center Support: Vendor personnel will answer phone calls from security community and subjects of investigation, focusing on issue resolution. Vendor personnel will utilize system(s) of record of record to provide responses to inquiries involving the personnel security clearance process. Vendor personnel will respond to inquiries on functional questions of e-QIP, perform e-QIP account resets, and respond to any issues involving the initiation/continuation of e-QIP investigation requests. In

addition, Vendor personnel will answer questions from security professionals regarding clearance(s). Vendor Task Lead will identify trends to support the update of training, communication and knowledge applications.

5.16 <u>Continuous Evaluation (CE)</u>: Vendor personnel will support the DoD CE mission. The records flagged by CE will be reviewed, analyzed, and distributed into Low, Medium, High risk categories. Low, Medium and High Risk Reports will be forwarded to appropriate government office(s) for action and recorded in the system(s) of record.

5.17 <u>Reports</u>: The Vendor shall provide the required reports in accordance with the deliverables schedule located in Technical Exhibit 2.

(emphasis in original).

Section 7.1 of the DSS Solicitation established a performance objective, a standard for assessing whether contractor performance satisfied the objective, a performance threshold, and a method of surveillance for each "Specific Task" contained in Part of 5 the Solicitation. The performance objective for Section 5.16 of the Solicitation, titled "Continuous Evaluation (CE)," was "[t]he Vendor shall process Continuous Evaluation reports IAW [in accordance with] Section 5.16 of the PWS." The standard for assessing whether performance satisfied the objective for Section 5.16 of the Solicitation was "[t]he Vendor processed reports accurately, using proper procedures in the necessary timeframe," and the performance threshold for Section 5.16 of the Solicitation was "[p]rocessed data with a minimum of 95% accuracy." Section 7.3 of the Solicitation estimated that there would be 225,000 CE reports to process per year and estimated that it would take four minutes to process a report. In accordance with a section of the Solicitation titled "Evaluation Factors for Award," proposals received by the DSS were to be evaluated on the following three factors: (1) past performance; (2) technical capability; and (3) price.

Prior to the DSS Solicitation's closing time on July 8, 2016, the DSS received proposals from Advanced Onion, Inc. (Advanced Onion), Sayres and Associates Corporation, ANASEC, Inc., and Xcelerate Solutions. The DSS' technical evaluation team, contract specialist, and contracting officer began evaluating the four proposals on July 12, 2016. On July 21, 2016, the contract specialist "sent discussions items" to Advanced Onion, Sayres and Associates Corporation, ANASEC, Inc., and Xcelerate Solutions and established a post-discussions proposal submission deadline on July 27, 2016. All four vendors timely submitted post-discussion proposal revisions.

Advanced Onion's proposal listed IEA as a proposed subcontractor. In its post-discussion proposal, Advanced Onion included the following discussion of Section 5.16 of the Solicitation and its CE efforts:

[redacted]

(alterations and emphasis in original). Advanced Onion's proposal did not appear to provide how many full-time equivalents would be dedicated to performing the requirements set forth in Section 5.16 of the Solicitation.

In its proposal, Xcelerate Solutions also addressed how it would execute the specific task listed in Section 5.16 of the Solicitation. Xcelerate Solutions' post-discussion proposal included the following discussion regarding performance of Section 5.16 of the Solicitation:

[redacted]

In the staffing plan contained in Xcelerate Solutions' post-discussions proposal, Xcelerate Solutions allocated [redacted] full-time equivalents to performing the requirements set forth in Section 5.16 of the Solicitation.

On August 11, 2016, the DSS awarded Contract No. HS0021-16-C-0006 to Xcelerate Solutions (the Xcelerate Solutions' Contract). The Xcelerate Solutions' Contract was a firm-fixed-price contract with a base period of performance of four months, from August 15, 2016 through December 14, 2016, and contained four one-year option periods. As awarded, Xcelerate Solutions' Contract had a total potential contract value of approximately $15.3 million if all four option periods were exercised. Under the Xcelerate Solutions' Contract as awarded, the base period was valued at $1,040,377.60, the first option period was valued at $3,121,132.80, the second option period was valued at $3,152,544.00, the third option period was valued at $3,184,012.80, and the fourth option period was valued at $3,216,096.00. Under the Xcelerate Solutions' Contract, Xcelerate Solutions was required "to provide operational Vendor support to the Personnel Security Management Office for Industry (PSMO-I) with the Defense Security Service (DSS)." Xcelerate Solutions' Contract contained the same Background, Objectives, Scope, and Specific Tasks sections as were provided for in the Solicitation. The Specific Task relevant to CE, contained in Section 5.16 of the Xcelerate Solutions' Contract, stated, as it also did in the Solicitation, that "Vendor personnel will support the DoD CE mission. The records flagged by CE will be reviewed, analyzed, and distributed into Low, Medium, High risk categories. Low, Medium and High Risk Reports will be forwarded to appropriate government office(s) for action and recorded in the system(s) of record."

Approximately one month after the DSS awarded the Xcelerate Solutions' Contract to Xcelerate Solutions, on September 7, 2016, the WHS issued Modification No. 01 to IEA's Task Order, which, effective September 23, 2016, exercised the first option period under IEA's Task Order pursuant to Federal Acquisition Regulation (FAR) 52.217-9.[3]

---

[3] The regulation at FAR 52.217-9, titled "Option To Extend the Term of the Contract," as modified in IEA's Task Order, provides:

(a) The Government may extend the term of this contract by written notice

Modification No. 01 of IEA's Task Order stated that the period of performance for the first option period of IEA's Task Order was September 23, 2016 to September 22, 2017, and provided that the "total cost of this contract was increased by $2,779,781.84 from $1,506,694.36 (EST) to $4,286,476.20 (EST)." According to the parties' Joint Stipulation of Facts, although Modification No. 01 of IEA's Task Order was issued by the WHS, the DSS had begun to provide the funding for IEA's Task Order "since at least September 23, 2016."

In addition, as Xcelerate Solutions was nearing the end of the base period of performance of the Xcelerate Solutions' Contract with the DSS, on December 7, 2016, the DSS issued Modification No. P00001 to the Xcelerate Solutions' Contract, which exercised the first option period under the Xcelerate Solutions' Contract pursuant to FAR 52.217-9. Xcelerate Solutions' Contract's first option period began on December 15, 2016, and concluded on December 14, 2017.

Following the issuances of Modification No. 01 to IEA's WHS Task Order on September 7, 2016, and Modification No. P00001 to Xcelerate Solutions' Contract on December 7, 2016, on December 19, 2016, the DoD issued a memorandum regarding the "Realignment of the Department of Defense Continuous Evaluation Mission and Resources to the Defense Security Service." In the December 19, 2016 memorandum, the then-Director for Defense Intelligence (Intelligence & Security) stated:

> I hereby realign the Department of Defense (DoD) Continuous Evaluation (CE) mission and CE Validation Cell resources from the Security Policy and Oversight Division (SPOD) to the Defense Security Service (DSS). Upon this realignment, DoD's CE efforts will be managed by the DSS Personnel Security Management Office for Industry (PSMO-I). The Director, DSS, will prepare the Department to meet its goal of implementing CE on one million cleared personnel by the end of calendar year 2017.
>
> The Security Policy and Oversight Division will support DSS in the establishment of a CE Program of Record. Additionally, SPOD will update relevant DoD policies to outline the associated responsibilities, functions, relationships, and authorities.

---

> to the Contractor within before the end of the period of performance; provided that the Government gives the Contractor a preliminary written notice of its intent to extend any time before the contract expires. The preliminary notice does not commit the Government to an extension.
>
> (b) If the Government exercises this option, the extended contract shall be considered to include this option clause.
>
> (c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 60 months.

DSS will provide quarterly progress updates to me or my designee until further notice. In accordance with the Office of the Secretary of Defense core functions, the Office of the Under Secretary of Defense for Intelligence will retain all policy oversight and training authorities.

By letter dated August 30, 2017, the WHS informed IEA of its intention to extend the term of IEA's WHS Task Order by four months in accordance with FAR 52.217-8.[4] The August 30, 2017 letter also stated that "[t]his task order is no longer a requirement of the Office of the Under Secretary of Defense for Intelligence and Washington Headquarters Services." Thereafter, IEA sent several email messages to a contracting officer for the DSS requesting an opportunity to discuss the transfer of the CE "Validation Cell" from the WHS to the DSS, which does not appear to have happened.

On September 14, 2017, the WHS issued Modification No. 03 to IEA's Task Order pursuant to FAR 52.217-8 (2017).[5] Modification No. 03 to IEA's Task Order, which had an effective date of September 22, 2017, stated that its purpose was "to incorporate CLIN [Contract Line Item Number] 1003 to extend the task order for four months. All other terms and conditions remain the same." Modification No. 03, therefore, extended IEA's performance under IEA's Task Order with the WHS until January 22, 2018. Modification No. 03 also provided that the "total cost of this contract was increased by $925,427.28 from $4,286,476.20 (EST) to $5,211,903.48 (EST)." The parties' Joint Stipulation of Facts, which was submitted to the court on January 9, 2018, states, "[a]t this time, the [IEA's] contract is staffed with [redacted] FTEs [full-time equivalents] under the task order."

Three days later, on September 17, 2017, the "Chief, CE Cell" within the DSS submitted a document containing the subject "Recommendation to Modify Contract: HS0021-16-C0006" (Recommendation to Modify), which recommended that the DSS modify Xcelerate Solutions' Contract. The Recommendation to Modify Xcelerate Solutions' Contract stated:

PSMO-I is requesting to increase the resources within the scope of the

---

[4] The regulation at FAR 52.217-8, titled "Option To Extend Services," as modified in IEA's Task Order, provides:

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor at any time prior to the expiration of the order.

[5] Modification No. 02 of IEA's Task Order was issued to "correct the lines of accounting on CLIN [Contract Line Item Number] 1001 and 1002 via SLINs 100101 and 100201."

PSMO-I Support Services Contract. We are not adding scope to the contract, but clarifying activities that are in support of an existing task area. Per contract HS0021-16-C-0006, Item 5.16, Continuous Evaluation (CE), "Vendor personnel will support the DoD CE mission."

The Recommendation to Modify Xcelerate Solutions' Contract with DSS also included the following background information:

- At the time the contract was awarded, the full CE mission had not yet been moved to DSS PSMO-I (per USD/I memo signed 16DEC16) and the vendor's role was anticipated to be primarily flagging and categorizing the records for industry personnel. With PSMO- I assuming the full CE mission, the CE activities the vendor personnel will perform extend to the end-to-end processing of the CE alerts for the entire DoD enterprise population.

- Moving the work from the WHS contract to the PSMO-I contract will provide efficiencies by combining the two efforts into a single effort with no hand-off required. The current PSMO-I contract includes 4 minutes for flagging and categorizing each CE record (based on a quantity of 225,000 records), for a total of approximately 8 FTE. There is also an Analytic Cell contract that takes over 20+ minutes (depending on alert) to process each CE record; resulting in an estimated 32 FTE to process 225,000 records for a total of 41 FTE to support the end-to-end CE mission. The goal within DoD is to enroll over 3M personnel into CE based on risk and position with an estimated alert volume resulting in ~20% for action.

- The current period of performance (HS0021-16-C-0006) ends 14 Dec 2017 and provides the opportunity to modify before exercising Option Year 2.

Included in the Recommendation to Modify Xcelerate Solutions' Contract was a proposed modified performance work statement, which was red-lined from the existing Xcelerate Solutions' Contract, a justification and approval, market research analysis, independent government cost estimate market research, and independent government cost estimate historic data.

On October 23, 2017, a contracting officer for DSS sent an email message to Xcelerate Solutions regarding the Xcelerate Solutions' Contract. In her email, the contracting officer for the DSS requested a quote from Xcelerate Solutions for the attached "additional support services requirement under the PSMO-I Support Services contract HS0021-16-C-0006. DSS has updated the HS0021-16-C-0006 PWS to include the CE Cell effort and all changes are red-lined in the attached PWS for ease of review." In response, Xcelerate Solutions submitted its initial proposal for the proposed additional work on November 9, 2017, a second, revised proposal on December 5, 2017, and a

third, revised proposal on December 6, 2017. In its third, revised proposal, Xcelerate proposed adding [redacted] full-time equivalents for additional PSMO-I support and [redacted] equivalents for CE support during the second option period of the Xcelerate Solutions' Contract. Prior to the modification of the Xcelerate Solutions' Contract, Xcelerate Solutions had been providing "[redacted] FTEs [full-time equivalents], with [redacted] providing CE support."

On December 14, 2017, the contracting officer for Xcelerate Solutions' Contract with the DSS issued a Memorandum for Record regarding "PSMO-I Option Year II Exercise & In-scope Increase for CE Cell Mission." The Memorandum for Record stated the

> purpose of this modification is twofold: 1) Exercise Option Period II as requested by the Personnel Security Management Office for Industry (PSMO-I) Directorate of Defense Security Service (DSS) in the Purchase Request Memo received on 9 November 2017 and 2) execute an inscope [sic] increase to accommodate a growing Continuous Evaluation (CE) Mission and an increased budgetary authority and need for Personnel Security Investigations for Industry.

Additionally, the Memorandum for Record provided:

> At the time of contract award, the full CE mission had not come to fruition and pieces of the effort were still owned by Washington Headquarters Services (WHS). Per the Under Secretary of Defense for Intelligence's memo signed 16 December 2016, these efforts needed to come together and be unified under one contract and the full CE mission materialized in the HS0021-16-C-0006 PWS. At the time, the Contractor's role was anticipated to be primarily flagging and categorizing records for industry personnel without the full understanding of the entire mission. With PSMO-I now assuming the full CE mission, the CE activities the Contractor personnel will perform will now encompass the end-to-end processing of the CE alerts for the entire DoD enterprise population. Looking closer at the different contracts, the current PSMO-I contract provides four (4) minutes for flagging and categorizing of each CE record (based on a quantity of 225,000 records), for approximately eight Full Time Equivalents (FTE). The WHS Analytic Cell contract includes over 20 minutes (depending on alert) of processing for each CE record; resulting in an estimated 32 FTEs to process 225,000 records. Transferring the work from the WHS contract to the PSMO-I contract will provide efficiencies through consolidation of previously-separately-managed pieces of a singular effort.

According to the Memorandum for Record, "combining the two Government efforts into one complete CE effort" would not impact offerors who submitted proposals in response to the Solicitation "because the work is not different from what was initially solicited but now better defined or just increased." The contracting officer reasoned that

"[c]ontractors could have anticipated that as we gained a better understanding of this new CE mission that we might need to further define our requirement in order to support the greatest performance and success of the winning Contractor." Additionally, the contracting officer stated in her Memorandum for Record that "[a]n increase to the PSMO-I support is also only an increase not a change in the type of work being done," and that "[c]ontractors could also have anticipated that the Government might have an increased need for Personnel Security Investigations for Industry support over time as well."

That same day, December 14, 2017, the DSS issued Modification No. P00002 to Xcelerate Solutions' Contract (the Xcelerate Solutions' Modified Contract), which exercised the second option period of Xcelerate Solutions' Contract pursuant to FAR 52.217-9 and issued what was described in Modification No. P00002 as "an inscope [sic] change to the PWS" pursuant to FAR 52.212-4(c).[6] Section 5.1 of Xcelerate Solutions' Modified Contract, titled "Basic Services," was modified to provide that "[t]he vendor support shall perform functions, as directed by the government lead to facilitate Personnel Security Clearance / Continuous Evaluation tasks as described throughout Section 5." Section 5.16 of Xcelerate Solutions' Contract, titled "Continuous Evaluation (CE)," was renumbered to become Section 5.12 in Xcelerate Solutions' Modified Contract. Section 5.12 of Xcelerate Solutions' Modified Contract provided:

> Vendor personnel will receive, evaluate, and disseminate flags from the DoD CE capability in accordance with DoD established policy, guidelines, and procedures. Assess and validate CE flags using available data sources to attribute the information to a specific subject and determine if the information is relevant and actionable, in accordance with DoD established guidelines and procedures. Disseminate CE results and related correspondence to personnel security specialists, CI, insider threat (InT), and/or law enforcement (LE) personnel, as applicable, and within DoD established guidelines. Develop tracking tools, matrices, and templates to efficiently  analyze data and produce metrics which identify trends, referral status, and business rules efficiency. Support the DoD CE Program as required, including policy development, comment adjudication, formal coordination, and resource assessments. Provide logistical, data gathering, and presentation support to meet DoD CE Program requirements. Continually monitor and review CE processes and procedures to inform the government where efficiencies can be realized. Provide feedback to the DoD CE Program regarding the relevance and validity of the business rules for flags. Policies, procedures and strategies will be planned and integrated into the CE program as needed. Support the development and delivery of CE-related reports, briefings, and training as needed. Assist with the agenda setting and facilitation of DoD CE Working Groups, and other CE-related forums as required. Provide administrative support as necessary, to include

---

[6] The regulation at FAR 52.212-4, titled "Contract Terms and Conditions Commercial Items," states, in part, that "[c]hanges in the terms and conditions of this contract may be made only by written agreement of the parties." See FAR 52.212-4(c) (2017).

planning meetings, tracking action items, and preparing read-ahead briefing material, meeting minutes, formal correspondence packages, activity reports, senior leadership reports, and travel/training/personnel documents.[7]

Section 7.3 of Xcelerate Solutions' Modified Contract with DSS estimated that Xcelerate Solutions would process 80,000 CE reports per year, with each CE report taking approximately thirty-six minutes to process.

Modification No. P00002 to Xcelerate Solutions' Contract further stated that the "total cost of this contract was increased by $7,100,371.20 from $4,161,510.40 to $11,261,881.60." Of the $7,100,371.20, the exercise of the second option period originally contained in Xcelerate Solutions' Contract, which was contained in Contract Line Item Numbers 2001, 2002, and 2003, increased the total cost of Xcelerate Solutions' Modified Contract by $3,152,544.00.[8] The additional work added to the Xcelerate Solutions' Modified Contract for "DoD Continuous Evaluation Mission support increase/further definition in accordance with the updated Performance Work Statement Part 5, executed in P00002," which was contained in Contract Line Item Number 2005, increased the total cost of the Xcelerate Solutions' Modified Contract by [redacted]. The additional work for "[i]ncreased Personnel Security Operational support in accordance with the updated Performance Work Statement Part 5, executed in P00002," which was contained in Contract Line Item Number 2004, increased the total cost of the Xcelerate Solutions' Modified Contract by [redacted]. Additionally, Modification No. P00002 contained two individually-priced option periods totaling [redacted] for "DoD Continuous Evaluation Mission support increase/further definition," as reflected in Contract Line Item Numbers 3005 and 4005, and two individually-priced option periods totaling [redacted] for "[i]ncreased Personnel Security Operational support," as reflected in Contract Line Item Numbers 3004 and 4004.[9] Cumulatively, the total potential value of Modification No.

---

[7] The majority of the specific tasks listed in Section 5.12 of Xcelerate Solutions' Modified Contract are identical to the performance requirements contained in Section C-2 of IEA's Task Order described above.

[8] Contract Line Item Number 2001 was an option for "PSMO-I: Personnel Security Operational support to review and process personnel security documentation as it relates to the NISP in accordance with PWS Part 5." Contract Line Item Number 2002 was an option for "Contract Manpower Reporting In Accordance With PWS Section 1.6.12." Contract Line Item Number 2003 was an option for work "[i]n accordance with the attached CDRLs [contract data requirements lists] in Section J of the Contract."

[9] The parties, in their Joint Stipulation of Facts, state that "[s]imilar CLINs [Contract Line Item Numbers] were included for the third and fourth option years. The CLINs for all option years, when combined, equaled $7,100,731." (internal reference omitted). The prices for the four Contract Line Item Numbers which represent the option periods established for the newly established third and fourth option periods in Contract Line Item Numbers 3004, 3005, 4004, and 4005 under Xcelerate Solutions' Modified Contract, however, are [redacted]; [redacted]; [redacted]; and [redacted]. When added together, the new Contract Item Line Numbers "for the third and fourth option years" total [redacted].

P00002 of Xcelerate Solutions' Contract, excluding the previously existing option period contained in Contract Line Item Numbers 2001, 2002, and 2003 under Xcelerate Solutions' Contract, was [redacted].

Also on December 14, 2017, the DoD issued an online press release regarding Xcelerate Solutions' Modified Contract, which provided:

> Celerity Government Solutions, LLC dba Xcelerate Solutions in McLean, VA, was awarded a $7,100,731.20 contract modification (P00002) to previously awarded contract HS0021-16-C-0006 for the Defense Security Service Personnel Security Management Office for Industry (PSMO-I) Support Services effort. The modification increases the total cumulative face value of the contract by $7,100,371.20 from $4,161,510.40 to $11,261,881.60. This modification exercised the next option, increases the definition of the Continuous Evaluation Mission and increases the already existing PSMO-I support for continued Personnel Security Operational Support to review and process personnel security documentation. Work will be performed at the Government's facility located in Hanover, Maryland with an expected completion date for this option period of December 14, 2018 or a potential ultimate contract completion date of June 14, 2021. This option will be fully funded. The Defense Security Service Office of Acquisitions, Quantico, Virginia is the contracting activity (HS0021-16-C-0006).

Xcelerate Solutions issued its own online press release regarding the Xcelerate Solutions' Modified Contract on December 14, 2017, which stated:

> Xcelerate Solutions has been awarded a $7,100,731 contract modification to their Defense Security Service (DSS) Personnel Security Management Office for Industry (PSMO-I) support services effort. Along with exercising the second option year of the contract, this modification increases the current PSMO-I support for continued personnel security operational support in reviewing and processing documentation for Department of Defense (DoD) contractors' personnel security clearances. This modification also significantly expanded the contract's Continuous Evaluation (CE) mission, incorporating the work previously performed by the CE Analytical Cell. Xcelerate will develop CE processes, procedures, and business rules; draft research reports; collect metrics; and assess and validate CE flags.

IEA filed a single-count complaint in the above-captioned bid protest on January 2, 2018. In its complaint, IEA alleges that, because the DSS' modification of "the Xcelerate PSMO-I Contract to have Xcelerate perform analytical and policy development support for the DoD CE Program exceeds the scope of the contract as solicited, Defendant's use of the PSMO-I Contract to obtain those services is unlawful and contrary to CICA's

statutory mandate for full and open competition."[10] IEA argues that the Solicitation did not contemplate the awardee providing "*any* direct support" for the DoD CE program, and the specific tasks listed in the performance work statement of Xcelerate Solutions' Contract "makes clear that CE is an entirely separate function." (emphasis in original). IEA's complaint seeks a "preliminary and permanent injunctions enjoining Defendant from procuring analytical and policy development support services for the DoD CE Program under Xcelerate's PMSO-I contract, or any other non-competitively-awarded task order or contract, pending adjudication of this protest . . . ." Additionally, IEA requests this court "enter an order directing Defendant to acquire analytical and policy development support for the DoD CE Program through the previously competed and competitively awarded task order held by IEA until such time as Defendant makes another competitive award of a contract for such services . . . ." IEA also filed an application for an emergency temporary restraining order and preliminary injunction on January 2, 2018, which the court denied at an in-person hearing on January 3, 2018.

On January 12, 2018, IEA, defendant, and defendant-intervenor filed simultaneous motions for judgment on the Administrative Record pursuant to Rule 52.1(c) (2017) of the Rules of the United States Court of Federal Claims (RCFC), and the defendant filed a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) (2017). IEA asserts in its motion for judgment on the Administrative Record that its protest must be sustained because the DSS acted contrary to law when it allegedly failed to comply with CICA by issuing a modification that was not within the scope of Xcelerate Solutions' Contract. In its motion to dismiss and cross-motion for judgment on the Administrative Record, the defendant argues that Modification No. P00002 was within the scope of Xcelerate Solutions' Contract, and, "[b]ecause the base PSMO-I Contract was properly modified, this Court lacks jurisdiction over IEA's claim." Defendant-intervenor argues that "Xcelerate has been providing CE support since the PSMO-I Contract was awarded, and the Modification did not change the type of services that Xcelerate is providing. Rather, the Modification increased the amount of work." The protestor, defendant, and defendant-intervenor filed simultaneous replies to their motions for judgment on the Administrative Record on January 16, 2018. On January 18, 2018, the court held an oral argument in the above-captioned bid protest. On January 19, 2018, in order to provide the parties with a resolution of the above-captioned bid protest prior to the expiration of IEA's Task Order with the WHS on January 22, 2018, the court issued an oral decision in a hearing with the parties. This decision incorporates and memorializes the January 19, 2018 oral decision.

## DISCUSSION

RCFC 52.1(c) governs motions for judgment on the Administrative Record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp.

---

[10] IEA did not challenge Modification No. P00002's exercise of the previously existing second option period under Xcelerate Solutions' Contract, as reflected in Contract Line Item Numbers 2001, 2002, and 2003, or the requirement of "[i]ncreased Personnel Security Operational support," as reflected in Contract Line Item Number 2004.

v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005))); see also Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'"); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and

(2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2000)), reh'g and reh'g en banc denied (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[11]

---

[11] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

---

5 U.S.C. § 706.

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater

Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

On a motion for judgment on the administrative record, a disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl.

735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013). To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions.  See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; and Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Vintage Autoworks, Inc. v. United States, 132 Fed. Cl. 143, 149 (2017) (using a "substantial chance" test); Active Network, LLC v. United States, 130 Fed. Cl. 421, 427 (2017) (using a "substantial chance" test); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

As described above, IEA asserts that the DSS' issuance of Modification No. P00002 to Xcelerate Solutions' Contract was contrary to law because Modification No. P00002 to Xcelerate Solutions' Contract violated "CICA's requirements for full and open competition." CICA generally directs executive agencies, "in conducting a procurement for property or services" to "obtain full and open competition though the use of competitive procedures." 41 U.S.C. § 3301(a)(1) (2012). As stated by the United States Court of Appeals for the Federal Circuit:

> CICA, however, does not prevent modification[12] of a contract by requiring a new bid procedure for every change. Rather only modifications outside

---

12 According to FAR 2.101(b), "[c]ontract modification means any written change in the terms of a contract (see [FAR] 43.103)." FAR 2.101(b) (2017). FAR 43.103 further

the scope of the original competed contract fall under the statutory competition requirement. CICA sets forth no standard for determining when modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement.

AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d 1201, 1204-05 (Fed. Cir.) (footnote removed), reh'g denied, en banc suggestion declined (Fed. Cir.), suggestion for reh'g declined (Fed. Cir. 1993). Contract modification for changes beyond the scope of the original procurement, however, should not be utilized as a way to avoid competition. See Tetra Tech, Inc. v. United States, 131 Fed. Cl. 653, 661 (2017); HDM Corp. v. United States, 69 Fed. Cl. 243, 253 (2005) (citation omitted); CESC Plaza Ltd. P'ship v. United States, 52 Fed. Cl. 91, 93 (2002). Modifying an existing contract so that it materially departs from the scope of the original procurement violates CICA by preventing potential

---

provides that:

> [c]ontract modifications are of the following types:
>
> (a) Bilateral. A bilateral modification (supplemental agreement) is a contract modification that is signed by the contractor and the contracting officer. Bilateral modifications are used to—
>
>> (1)  Make negotiated equitable adjustments resulting from the issuance of a change order;
>>
>> (2)  Definitize letter contracts; and
>>
>> (3)  Reflect other agreements of the parties modifying the terms of contracts.
>
> (b) Unilateral. A unilateral modification is a contract modification that is signed only by the contracting officer. Unilateral modifications are used, for example, to--
>
>> (1) Make administrative changes;
>>
>> (2) Issue change orders;
>>
>> (3) Make changes authorized by clauses other than a changes clause (e.g., Property clause, Options clause, or Suspension of Work clause); and
>>
>> (4) Issue termination notices.

FAR 43.103 (2017).

bidders from participating in or competing for what should be a new procurement. See Tetra Tech, Inc. v. United States, 131 Fed. Cl. at 661; Portfolio Disposition Mgmt. Grp. LLC v. United States, 64 Fed. Cl. 1, 12 (2005) ("This Court has recognized the well-established principle that the 'contract awarded must be the one for which the offerors have competed.'" (citation omitted)); HDM Corp. v. United States, 69 Fed. Cl. at 253; see also AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1205; VMC Behavioral Healthcare Servs. v. United States, 50 Fed. Cl. 328, 332 (2001).   A modification that is within the scope of the original procurement "does not raise a viable protest under [28 U.S.C.] § 1491(b)(1)." See Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1346 (Fed. Cir. 2008); see also Ceradyne, Inc. v. United States, 103 Fed. Cl. 1, 12-13 (2012) (citing AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1204-05) ("If the modification materially departs from the scope, then a new competition may be required and jurisdiction will stand. . . .  If the modification was, however, within the scope of the solicitation, the protest must be dismissed."); RhinoCorps Ltd. Co. v. United States, 87 Fed. Cl. 481, 489 (2009) (citing AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1205) ("[T]o sustain a bid protest stemming from a change or modification to a contract, the protestor must allege facts that establish that the modification falls outside the scope of the original contract, thereby triggering the statutory competition requirement. If any change made to a procurement is within the scope of work originally contemplated, no competition is required, and jurisdiction is not present.").[13]

The United States Court of Appeals for the Federal Circuit, specifically, has recognized that modifications of an existing contract are permissible to procure products or services, as long as the modification is "within the scope of the original competitive procurement." AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1205; see also Krygoski

---

[13] The defendant argues that this court lacks jurisdiction over IEA's claim because Modification No. P00002 of Xcelerate Solutions' Contract was within the scope of Xcelerate Solutions' Contract. Although a number of decisions in the United States Court of Federal Claims indicate that this court lacks jurisdiction over a protest challenging a modification to a contract that is within the scope of the original procurement, one judge has argued in a footnote that these decisions "have elided the distinction between jurisdiction and merits, on the grounds that a modification within the scope of the contract does not involve a procurement and, therefore, does not trigger jurisdiction under [28 U.S.C. §] 1491(b)(1)." Int'l Genomics Consortium v. United States, 104 Fed. Cl. 669, 675 n.7 (2012). Given that a court's analysis of whether a modification to a contract is within the scope of the original procurement requires the court to consider the merits of a protestor's complaint, and considering the Federal Circuit's guidance that the meaning of "procurement" under Section 1491(b)(1) extends to "'all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout,'" Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1381 (emphasis in original) (citation removed), a protest that challenges a modification to a contract that is within the scope of the original procurement may be more appropriately dismissed under RCFC 12(b)(6) (2017) for failure to state a claim upon which relief may be granted, rather than under RCFC 12(b)(1) for lack of subject matter jurisdiction.

<u>Constr. Co. v. United States</u>, 94 F.3d 1537, 1543 (Fed. Cir.) (relying on <u>AT & T Communications, Inc. v. Wiltel, Inc.</u> in its analysis of a necessary change to a contract's scope), <u>reh'g denied, en banc suggestion declined</u> (Fed. Cir. 1996), <u>cert. denied</u>, 520 U.S. 1210 (1997); <u>Tetra Tech, Inc. v. United States</u>, 131 Fed. Cl. at 661 ("To determine whether a modification is within the scope of the original solicitation, the court must compare the contract, as modified, with the scope of the competition conducted to achieve the original contract." (citing <u>AT & T Commc'ns, Inc. v. Wiltel, Inc.</u>, 1 F.3d at 1205)); <u>Aircraft Charter Sols., Inc. v. United States</u>, 109 Fed. Cl. 398, 410-11 (2013) (utilizing <u>AT & T Communications, Inc. v. Wiltel, Inc.</u> to determine whether a modification was within the scope of a contract); <u>Golden Mfg. Co., Inc. v. United States</u>, 107 Fed. Cl. 264, 274 (2012) (relying on <u>AT & T Communications, Inc. v. Wiltel, Inc.</u> when discussing an amendment to a contract solicitation); <u>Solute Consulting v. United States</u>, 103 Fed. Cl. 783, 792 (2012) (applying <u>AT & T Communications, Inc. v. Wiltel, Inc.</u> to the issue of the in-scope contract modification); <u>Ceradyne, Inc. v. United States</u>, 103 Fed. Cl. at 12 (analyzing <u>AT & T Communications, Inc. v. Wiltel, Inc.</u> to determine whether the contract modification was within the scope of the original procurement); <u>RN Expertise, Inc. v. United States</u>, 97 Fed. Cl. 460, 473 (using <u>AT & T Communications, Inc. v. Wiltel, Inc.</u> as a basis for the court's analysis of the contract modification), <u>recons. denied</u> (2011).

Because CICA does not define whether a modification of an existing contract is beyond or within the scope of the original competitive procurement, the Federal Circuit has at times analogized to the cardinal change doctrine as the test to ascertain whether the modification is in-scope or violates the competition requirements of CICA. See <u>AT & T Commc'ns, Inc. v. Wiltel, Inc.</u>, 1 F.3d at 1205 ("The cardinal change doctrine asks whether a modification exceeds the scope of the contract's changes clause; this case asks whether the modification is within the scope of the competition conducted to achieve the original contract. In application, these questions overlap."); <u>see also Ceradyne, Inc. v. United States</u>, 103 Fed. Cl. at 12 n.9; <u>Cardinal Maint. Serv., Inc. v. United States</u>, 63 Fed. Cl. 98, 106 (2004); <u>GraphicData, LLC v. United States</u>, 37 Fed. Cl. 771, 781 (1997). "'[A] cardinal change . . . occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for.'" <u>AT & T Commc'ns, Inc. v. Wiltel, Inc.</u>, 1 F.3d at 1205 (quoting <u>Allied Materials & Equip. Co. v. United States</u>, 215 Ct. Cl. 406, 409, 569 F.2d 562, 563-64 (1978)); <u>see also Krygoski Constr. Co. v. United States</u>, 94 F.3d at 1543. "Just as the cardinal change doctrine prohibits an agency from compelling a contractor to perform contract terms that are not within the scope of the original bargain, the CICA prevents an agency from modifying a contract to such an extent that the modified contract is 'materially different' from the contract for which a competition was held." <u>GraphicData, LLC v. United States</u>, 37 Fed. Cl. at 781 (citing <u>AT & T Commc'ns, Inc. v. Wiltel, Inc.</u>, 1 F.3d at 1205); <u>see also Mgmt. Solutions & Sys., Inc. v. United States</u>, 75 Fed. Cl. 820, 830 (2007); <u>cf. Solute Consulting v. United States</u> 103 Fed. Cl. at 793 (discussing the merits of the GAO's application of the "material difference standard" to multiple-award contracts and its conclusion that "'[t]he analysis of whether a task order is outside the scope of a multiple-award contract is the same as the analysis of whether a contract modification is outside the scope of a single-award contract'" (alteration in original) (quoting <u>DynCorp Int'l LLC</u>, B-402349, 2010 CPD ¶ 59 (Comp. Gen. Mar. 15, 2010))).

When determining whether a modification "materially departs" from the scope of the original procurement, a court should consider: "(1) whether the modification is of a nature which potential offerors would reasonably have anticipated; and (2) whether the modification substantially changes the type of work, performance period, and costs as between the original contract and the modified contract." Portfolio Disposition Mgmt. Grp. LLC v. United States, 64 Fed. Cl. at 12 (citation omitted); see RN Expertise, Inc. v. United States, 97 Fed. Cl. at 473-74 (citing AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1205, 1207); see also Aircraft Charter Sols., Inc. v. United States, 109 Fed. Cl. at 411 (citation omitted). The analysis of whether a contract modification "materially departs" from the scope of the original procurement "focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified." AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1205. "Thus a broad original competition may validate a broader range of later modifications without further bid procedures." Id.; see also Cal. Indus. Facilities Res., Inc. v. United States, 104 Fed. Cl. 589, 598 (2012). To determine whether a modification is within the scope of the original procurement, a court should consider whether the modification "substantially changes 'the type of work, performance period, and costs as between the original contract and the modified contract.'" CESC Plaza Ltd. P'ship v. United States, 52 Fed. Cl. at 93 (quoting CCL, Inc. v. United States, 39 Fed. Cl. 780, 791 (1997)); see also Portfolio Disposition Mgmt. Grp. LLC v. United States, 64 Fed. Cl. at 12 (citing Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. at 106); Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. at 106 (noting that the question of whether "the contract, as modified, is materially different from the contract that was originally competed . . . turns on whether the original contract, as modified, calls for 'essentially the same performance'" (quoting Exec. Bus. Media, Inc. v. United States Dep't of Defense, 3 F.3d 759, 763 n.3 (4th Cir. 1993))); Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 466 (2001) (describing factors that courts have considered under the cardinal change doctrine, including "[c]hanges in the type of product or service that were not anticipated due to their lack of resemblance to the original procurement," "[s]ignificant addition or subtraction of the quantity of work," and "[a]dditional time spent on performance of a contract . . . when such time is extended in order to add significantly more quantity or new requirements to the contract").

"Because every situation in which parties enter into a contractual relationship is unique, there is no definitive test for determining whether a change is beyond the scope of a particular contract." Keeter Trading Co. v. United States, 79 Fed. Cl. 243, 260 (2007) (citation omitted); see also Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1332 (Fed. Cir.), reh'g and reh'g en banc denied, 346 F.3d 1359 (Fed. Cir. 2003), cert. denied, 541 U.S. 987 (2004) ("The finding of a cardinal change is 'principally a question of fact'" (quoting Allied Materials & Equip. Co. v. United States, 215 Ct. Cl. at 411, 569 F.2d at 565)); Golden Mfg. Co., Inc. v. United States, 107 Fed. Cl. at 274 ("In emphasizing that there is no mechanical or arithmetical answer, we have repeated that (t)he number of changes is not, in and of itself, the test[.]" (alterations in original) (quoting Air-A-Plane Corp. v. United States, 187 Ct. Cl. 269, 276, 408 F.2d 1030, 1033 (1969))); ThermoCor, Inc. v. United States, 35 Fed. Cl. 480, 490 (1996) ("'Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a

whole.'" (quoting Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 194, 351 F.2d 956, 966 (1965))).

In addition, as indicated by the United States Court of Appeals for the Federal Circuit, a factor to consider when determining the scope of the original competition is "'whether the solicitation for the original contract adequately advised offerors of the potential for the type of changes during the course of the contract that in fact occurred, or whether the modification is of a nature which potential offerors would reasonably have anticipated.'" AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1207 (quoting Neil R. Gross & Co., Inc., B-237434, 90-1 CPD ¶ 212 (Comp. Gen. Feb. 23, 1990) (citation omitted)); see also Tetra Tech, Inc. v. United States, 131 Fed. Cl. at 661; RN Expertise, Inc. v. United States, 97 Fed. Cl. at 474; Chapman Law Firm Co. v. United States, 81 Fed. Cl. 323, 327 (2008). "A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause." AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1205; see also Aircraft Charter Sols., Inc. v. United States, 109 Fed. Cl. at 410 (quoting AT & T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1205). Whether potential bidders would have anticipated a particular modification is judged under an objective standard, see Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 52, 56 (2009); CESC Plaza Ltd. P'ship v. United States, 52 Fed. Cl. at 93 (citing CCL, Inc. v. United States, 39 Fed. Cl. at 791), and "depends heavily on the language of the solicitation." See Northrop Grumman Corp. v. United States, 50 Fed. Cl. at 466 (citing JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 389 (3d ed. 1995)). If a court ultimately finds a modification "to be outside the reasonable expectations of the bidders, the government must show that it adequately advised the bidders that such a change might occur." Northrop Grumman Corp. v. United States, 50 Fed. Cl. at 465 (citation omitted).

In the above-captioned bid protest, IEA "agree[s]" that the "DoD can reorganize and transfer responsibility for the Continuous Evaluation program to DSS. The parties also agree that DoD is not obligated to extend IEA's contract." IEA, however, challenges the aspect of Modification No. P00002 "that includes the Validation Cell work, and which is referred to in the modification documents as 'Continuous Evaluation services.'"[14] During oral argument on January 18, 2018 and the hearing on January 19, 2018, IEA identified the portion of Modification No. P00002 of Xcelerate Solutions' Contract that IEA was challenging as the work contained in Contract Line Item Numbers 2005, 3005, and 4005 in Modification No. P00002. IEA asserts that the terms of the Solicitation and Xcelerate Solutions' Contract are not broad enough to include Modification No. P00002 because "[i]t does not include any language about validating the flagged records once they are received, or providing any other analytical or policy support to the Continuous Evaluation program." IEA also alleges that "no offeror could have anticipated that the PSMO-I contract would be required to provide support in the form of validation and analytical and policy support." According to IEA, that no offeror could have anticipated such a change is confirmed by the fact that none of the proposals submitted to the DSS in response to the

---

[14] The court notes that the documents for Modification No. P00002 do not include the words "Continuous Evaluation services."

Solicitation "discussed validating flags, providing feedback to DoD on potential efficiencies, or advising DoD on policies for the Continuous Evaluation program . . . ." Additionally, IEA contends that the increase in the dollar value of Xcelerate Solutions' Contract and the number of full-time equivalents Xcelerate Solutions needed to provide under Xcelerate Solutions' Modified Contract demonstrates that Modification No. P00002 of Xcelerate Solutions' Contract is an out-of-scope modification. IEA alleges that Modification No. P00002 "nearly doubles the price of the contract as awarded," caused Xcelerate Solutions to add "almost *four times* the amount of staff to support the work," and that the CE-related work "under the PSMO-I contract takes only four minutes per record, while the Validation Cell work takes more than twenty minutes per record." (emphasis in original). Moreover, IEA asserts that the terms of the Solicitation and Xcelerate Solutions' Contract are clear, and, to the extent the word "support" in the Solicitation and Xcelerate Solutions' Contract is ambiguous, that "the principle of *noscitur a sociis* confirms that the support sought is the specific support tasks elucidated in the same PWS task," which IEA contends only involves categorizing and distributing flagged CE records.[15] (emphasis in original).

Conversely, the defendant asserts that offerors to the Solicitation could have anticipated the issuance of Modification No. P00002 to Xcelerate Solutions' Contract because "the solicitation's background advised offerors that '[p]rocessing information pertaining to cleared Industry from CE and DITMAC *will be a new mission* for DSS and PSMO-I effective FY 15,'" and "[a]ny reasonable offeror would expect that a 'new mission' has more variability . . . ." (emphasis and alterations in original). The defendant also argues that the "Objectives" section, "Scope" section, and the performance work statement of the Solicitation contemplated a broad array of tasks to be performed under the resulting contract. According to the defendant, Advanced Onion's proposal, which listed IEA as a potential subcontractor, demonstrates that offerors could have anticipated the issuance of Modification No. P00002 because Advanced Onion's proposal "described *the entire Continuous Evaluation process* . . . ." (emphasis in original). Moreover, the defendant alleges that Modification No. P00002 does not materially depart from the Xcelerate Solutions' Contract because Xcelerate Solutions' Contract's period of performance is unchanged, the type of services being provided under Xcelerate Solutions' Modified Contract are akin to those performed under Xcelerate Solutions' Contract, the quantity of the service being provided is not materially changed, and the cost of performance has not substantially changed. Similarly, defendant-intervenor asserts that Modification No. P00002 did not materially change Xcelerate Solutions' Contract because "the Modification has not changed the nature of the services provided under the PSMO-I Contract," as, under Xcelerate Solutions' Contract, Xcelerate Solutions "has been reviewing flagged reports, validating the reports and incidents, and sending the reports to DoD for adjudication."

---

[15] In its motion for judgment on the Administrative Record, IEA states that the "'doctrine of *noscitur a sociis* permits the Court to ascertain the meaning of ambiguous terms by reference to the terms with which they are associated.' *Auto-Ordnance Corp. v. United States*, 822 F.2d 1566, 1571 (Fed. Cir. 1987)." (emphasis in original).

Both the Recommendation to Modify and the Memorandum for Record noted that, when the Xcelerate Solutions' Contract was awarded to Xcelerate Solutions by DSS, the full CE program had not yet been moved to the DSS, and that the WHS was managing part of the CE program. The Recommendation to Modify and the Memorandum for Record also both state that, at the time of contract award, "the vendor's role was anticipated to be primarily flagging and categorizing the records for industry personnel," which, as stated in the Memorandum for Record, did not "encompass the end-to-end processing of the CE alerts for the entire DoD enterprise population." The Memorandum for Record also states that "[p]er the Under Secretary of Defense for Intelligence's memo signed 16 December 2016, these efforts needed to come together and be unified under one contract and the full CE mission materialized in the HS002-16-C-0006 PWS." According to the Recommendation to Modify, as well as the Memorandum for Record, transferring the work under the "WHS contract" to Xcelerate Solutions' Contract would be within the scope of Xcelerate Solutions' Contract because Section 5.16 of the Xcelerate Solutions' Contract provides that "Vendor personnel will support the DoD CE mission." Both government documents concluded that assigning the responsibility of administering the DoD CE program to Xcelerate Solutions, as stated in the Memorandum for Record, was not "an 'addition of different work' to the current PWS but clarification of activities that are in support of an existing task area and increase in resources of the same nature already under contract . . . ." The Memorandum for Record also noted that "[t]ransferring the work from the WHS contract to the PSMO-I contract will provide efficiencies through consolidation of previously separately-managed pieces of a singular effort." The Recommendation to Modify reached a substantially similar conclusion.

The court reviews Modification No. P00002 to Xcelerate Solutions' Contract in the context of the Solicitation as a whole. See Aircraft Charter Sols., Inc. v. United States, 109 Fed. Cl. at 415 ("It is the Solicitation as a whole, and especially the comparison of the context of the Solicitation with the contract modification challenged here, that must be weighed by the court." (citing AT & T Commc'ns v. Wiltel, Inc., 1 F.3d at 1207)). Section 1.2 of the Solicitation, as did Section 1.2 of Xcelerate Solutions' Contract, stated that "[p]rocessing information pertaining to cleared Industry from CE and DITMAC [Defense Insider Threat Management and Analysis Center] will be a new mission for DSS and PSMO-I effective FY15." According to Section 1.3 of the Solicitation and Section 1.3 of Xcelerate Solutions' Contract, titled "Objectives," the performance work statement indicates that the contractor "provides continuous Personnel Security Operational Support to review and process personnel security documentation as it relates to the NISP." Additionally, Section 1.4 of the Solicitation and also Section 1.4 of Xcelerate Solutions' Contract, titled "Scope," provided that the "Vendor shall be responsible for providing operational support to assist in the personnel clearance oversight and management . . . ." Section 5.1, titled "Basic Services," which was located in the performance work statement of the Solicitation as well as in Section 5.1 of Xcelerate Solutions' Contract, stated that the "Vendor shall support duties and processing requests to include . . . other evolving initiatives as related to Continuous Evaluation and the Defense Insider Threat Management Analysis Center." Section 5.16, titled "Continuous Evaluation (CE)," which was also located in the performance work statement, stated that "Vendor personnel will support the DoD CE mission. The records flagged by CE will be

<u>reviewed, analyzed, and distributed</u> into Low, Medium, High risk categories. Low, Medium and High Risk Reports will be forwarded to appropriate government office(s) for action and recorded in the system(s) of record." (emphasis added). Section 7.3 of the Solicitation, titled "Technical Exhibit 3: Estimated Workload Data,"[16] estimated that the awardee would be required to process 225,000 CE reports per year, with each report taking approximately four minutes to process.[17]

As noted in the Recommendation to Modify and Memorandum for Record, Xcelerate Solutions' Contract required Xcelerate Solutions to "support the DoD CE mission." Immediately following that sentence, however, was the requirement that "records flagged by CE will be reviewed, analyzed, and distributed into Low, Medium, High risk categories," which were to be "forwarded to appropriate government office(s) for action and recorded in the system(s) of record." Read in the context of the Solicitation and Xcelerate Solutions' Contract as a whole, including the objectives stated in Section 1.3 of the Solicitation and Section 1.3 of Xcelerate Solutions' Contract, which were to provide "continuous Personnel Security Operational Support to review and process personnel security documentation as it relates to the NISP," and the scope articulated in Section 1.4 of the Solicitation and Section 1.4 of Xcelerate Solutions' Contract, which was to provide "operational support to assist in the personnel clearance oversight and

---

[16] Although the parties state in their Joint Stipulation of Facts that Xcelerate Solutions' "contract included the same background, objectives, scope, tasks, applicable publications, technical exhibits, and deliverables as were provided for in the Solicitation," the technical exhibit in Section 7.3 of the Solicitation does not appear to be in Xcelerate Solutions' Contract.

[17] The defendant-intervenor asserts that the "Solicitation also included deliverables directly related to CE, such as task status/progress reports and trend analyses." To support its assertion, the defendant-intervenor cites to Section 7.2 of the Solicitation, titled "Technical Exhibit 2: Deliverables Schedule," which states that the awardee will provide a "Task Status/Progress Report in accordance with Section 5.16.6 of the PWS" and "Trend Analysis in accordance with Section 5.16.6 of the PWS" on a weekly basis. Section 7.2 of Xcelerate Solutions' Contract contains identical language to Section 7.2 of the Solicitation. Neither the Solicitation nor Xcelerate Solutions' Contract contain a "Section 5.16.6." In Xcelerate Solutions' Modified Contract, however, Section 7.3, titled "Technical Exhibit 3: Deliverables Schedule," stated that Xcelerate Solutions was to provide a task status/progress report and trend analysis on a weekly basis in accordance with Section 5.14, titled "Reports" of the Xcelerate Solutions' Modified Contract, which provides "[t]he Vendor shall complete Government provided performance tracking on a weekly basis for each full time contracting employee and provide the required reports in accordance with the deliverables schedule located in Technical Exhibit 2 and 3." The Solicitation and Xcelerate Solutions' Contract also contained a section titled "Reports," which provides "[t]he Vendor shall provide the required reports in accordance with the deliverables schedule located in Technical Exhibit 2." Thus, it is unclear whether the "task status/progress report and trend analyses" required under Section 7.2 of the Solicitation were "directly related to CE . . . ."

management," Xcelerate Solutions was to support the DoD CE program by reviewing, analyzing, and distributing records flagged by the DoD CE program into Low, Medium, and High risk categories, and forwarding reports of the flagged records to the appropriate government offices.

Modification No. P00002 modified Xcelerate Solutions' Contract in several ways. First, as reflected in Contract Line Item Numbers 2001, 2002, and 2003, Modification No. P00002 exercised the second one-year option period of Xcelerate Solutions' Contract with the DSS. As reflected in Contract Line Item Number 2004, Modification No. P00002 "[i]ncreased Personnel Security Operational support in accordance with the updated Performance Work Statement Part 5, executed in P00002." Modification No. P00002 also created Contract Line Item Numbers 3004 and 4004, which were two consecutive one-year option periods for "[i]ncreased Personnel Security Operational support . . . ."[18] Additionally, Modification No. P00002 of Xcelerate Solutions' Contract provided for "DoD Continuous Evaluation Mission support increase/further definition in accordance with the updated Performance Work Statement Part 5, executed in P00002" during the second option period of Xcelerate Solutions' Contract. Modification No. P00002 of Xcelerate Solutions' Contract also created two consecutive one-year option periods under the Contract for "DoD Continuous Evaluation Mission support increase/further definition," as reflected in Contract Line Item Numbers 3005 and 4005.

Modification No. P00002 of Xcelerate Solutions' Contract also altered the objectives and scope sections in Xcelerate Solutions' Contract. Modification No. P00002 added language to Section 1.3 of Xcelerate Solutions' Modified Contract, titled "Objectives," that indicated the objective of the Xcelerate Solutions' Modified Contract now included obtaining

a knowledge-based analytic capability to validate alerts generated by the DoD Continuous Evaluation (CE) Program. The validation cell will use supporting systems to receive and determine the CE results meet established reporting criteria before forwarding adjudicative-relevant and actionable information to the DoD Consolidated Adjudication Facility (DoD CAF) and DoD Component security officials, as appropriate.

The following sentences were also added to Section 1.4, titled "Scope," of Xcelerate Solutions' Modified Contract:

DoD is evolving its CE program as directed by the Secretary of Defense's February 21, 2014 memorandum and in accordance with the Office of Management and Budget, "Report to the President, Suitability and Security Processes Review." To support DoD CE Program implementation, the Contractor shall provide the personnel necessary to support the accurate and timely validation CE flags as the program scales. Efforts include, but

---

[18] As noted, IEA is not challenging the modifications contained in Contract Line Item Numbers 2001, 2002, 2003, 2004, 3004, and 4004.

are not limited to, developing processes and procedures, assessing and validating flags generated by the DoD CE capability, developing business rules, drafting research reports, collecting metrics, and developing future CE requirements.

Additionally, Modification No. P00002 expanded the specific tasks prescribed by Section 5.16 of Xcelerate Solutions' Contract, titled "Continuous Evaluation (CE)," which was renumbered to become Section 5.12 of Xcelerate Solutions' Modified Contract. Section 5.12 of Xcelerate Solutions' Modified Contract, also titled "Continuous Evaluation (CE)," provided that Xcelerate Solutions:

> [W]ill receive, evaluate, and disseminate flags from the DoD CE capability in accordance with DoD established policy, guidelines, and procedures. Assess and validate CE flags using available data sources to attribute the information to a specific subject and determine if the information is relevant and actionable, in accordance with DoD established guidelines and procedures. Disseminate CE results and related correspondence to personnel security specialists, CI, insider threat (InT), and/or law enforcement (LE) personnel, as applicable, and within DoD established guidelines. Develop tracking tools, matrices, and templates to efficiently analyze data and produce metrics which identify trends, referral status, and business rules efficiency. Support the DoD CE Program as required, including policy development, comment adjudication, formal coordination, and resource assessments. Provide logistical, data gathering, and presentation support to meet DoD CE Program requirements. Continually monitor and review CE processes and procedures to inform the government where efficiencies can be realized. Provide feedback to the DoD CE Program regarding the relevance and validity of the business rules for flags. Policies, procedures and strategies will be planned and integrated into the CE program as needed. Support the development and delivery of CE-related reports, briefings, and training as needed. Assist with the agenda setting and facilitation of DoD CE Working Groups, and other CE-related forums as required. Provide administrative support as necessary, to include planning meetings, tracking action items, and preparing read-ahead briefing material, meeting minutes, formal correspondence packages, activity reports, senior leadership reports, and travel/training/personnel documents.

Although "receiv[ing], evaluat[ing], and disseminat[ing] flags from the DoD CE capability" and providing "administrative support" may have been within the scope of the Solicitation and Xcelerate Solutions' Contract, the additional requirements related to CE in Modification No. P00002 exceeded the scope of the CE work contemplated in the Solicitation and Xcelerate Solutions' Contract. The Solicitation and Xcelerate Solutions' Contract did not contemplate that Xcelerate Solutions would be providing "a knowledge-based analytic capability" for assessing and validating records flagged by the DoD's automated system. Rather, under Xcelerate Solutions' Contract with the DSS, Xcelerate Solutions was to review the records flagged by CE, which had been validated by "a

36

knowledge-based analytic capability" prior to being sent to Xcelerate Solutions, and distribute the flagged CE records into risk categories. Contrary to defendant's arguments, using available data sources to determine whether specific information is attributable to a specific clearance holder and determining whether the information is relevant and actionable differs from the review and distribution of flagged, validated CE records because, under the unmodified Xcelerate Solutions' Contract, Xcelerate Solutions' role was limited to the review and distribution of flagged, validated CE records into risk categories before forwarding the records to the relevant government officials.

The Solicitation and Xcelerate Solutions' Contract also were silent as to the development of "tracking tools, matrices, and templates to efficiently analyze data and produce metrics which identify trends, referral status, and business rules efficiency" and the provision of "logistical, data gathering, and presentation support to meet DoD CE Program requirements." Xcelerate Solutions' role in reviewing, analyzing, distributing, and forwarding flagged, validated CE records did not include developing tools to capture and analyze data in an effort to identify trends related to the efficiency of the entire DoD CE program or determining the efficiency of the DoD's CE program's business rules. Nor was Xcelerate Solutions' original role in the CE program under the unmodified Xcelerate Solutions' Contract with the DSS broad enough to encompass the following: "monitor[ing] and review[ing] CE processes and procedures to inform the government where efficiencies can be realized. Provide feedback to the DoD CE Program regarding the relevance and validity of the business rules for flags. Policies, procedures and strategies will be planned and integrated into the CE program as needed." Monitoring the DoD's CE program's processes, procedures, and business rules and informing DSS how the DoD CE program can realize efficiencies cannot be squared with Xcelerate Solutions' more limited role in the CE program under the unmodified Xcelerate Solutions' Contract because the analysis under Xcelerate Solutions' Modified Contract entails tracking and examining the DoD CE program as a whole and differs in substance from the analysis Xcelerate Solutions provided when reviewing, analyzing, and distributing a flagged record into a risk category.

Furthermore, supporting the DoD CE program with "policy development, comment adjudication, formal coordination, and resource assessments," "the development and delivery of CE-related reports, briefings, and training," and "agenda setting and facilitation of DoD CE Working Groups, and other CE-related forums" is outside of the scope of the Solicitation and the unmodified Xcelerate Solutions' Contract with DSS. Xcelerate Solutions' limited role in the DoD CE program under the unmodified Xcelerate Solutions' Contract did not include developing the policy and agenda, formal coordination, or assessing the resources of the entire DoD CE program. The work required in designing and implementing training programs for the DoD CE program and facilitating DoD CE working groups and other related forums also substantively differs from the work Xcelerate Solutions was undertaking pursuant to the unmodified Xcelerate Solutions' Contract, as Xcelerate Solutions was not responsible for creating and assisting with DoD CE program-wide activities unrelated to reviewing, analyzing, distributing, and forwarding flagged records. Moreover, the objective of the Solicitation and the unmodified Xcelerate Solutions' Contract was "to review and process personnel security documentation" and

the scope of the Solicitation and the unmodified Xcelerate Solutions' Contract was to provide "operational support to assist in the personnel clearance oversight and management . . . ." The additional tasks Modification No. P00002 assigned to Xcelerate Solutions were far more policy driven and were much broader, with additional focus on the DoD CE program in its entirety, than the more limited review and processing of personnel security documentation and provision of operational support which were contemplated in the objectives sections and scope sections in the Solicitation and unmodified Xcelerate Solutions' Contract. Indeed, both the objectives section and scope section in Xcelerate Solutions' Modified Contract were altered to include the new CE-related requirements prescribed by Contract Line Item Number 2005 in Modification No. P00002.

IEA also asserts that "the magnitude of the modification" is reflected in the increased amount of time and number of full-time equivalents the DSS anticipates that it will take Xcelerate Solutions to process CE reports under the Xcelerate Solutions' Modified Contract. The defendant contends that, as a result of the DSS' issuance of Modification No. P00002 to Xcelerate Solutions' Contract, the "actual change in the quantity of service is about 51.5 percent for option year two." The defendant calculates its "actual change in the quantity of service" by dividing the "[i]ncreased Continuous Evaluation minutes in modification P00002 ((2,880,000-900,000)" by the "Original PSMO-I Solicitation minutes (3,844,300) . . . ." After acknowledging that an increase of 51.5 percent is "non-trivial," the defendant asserts that such an increase is not substantial enough to demonstrate an out-of-scope modification without a corresponding change in the nature and purpose of Xcelerate Solutions' Contract. The increase, however, in the "quantity of service" related to the DoD CE program being provided under Xcelerate Solutions' Modified Contract is much greater than approximately 51.5 percent when compared to the "quantity of service" related to the DoD CE program under the Solicitation and the unmodified Xcelerate Solutions' Contract. Section 7.3 of the Solicitation estimated that the awardee would "COMPLETE" 225,000 CE reports annually at an estimated rate of four minutes per CE report, which produces a total estimate of 900,000 minutes per year dedicated to completing CE reports. (capitalization in original). Under the unmodified Xcelerate Solutions' Contract, Xcelerate Solutions was providing "[redacted] FTEs [full-time equivalents], with [redacted] providing CE support." Xcelerate Solutions' Modified Contract, however, estimated that Xcelerate Solutions would "COMPLETE" 80,000 CE reports annually at an average rate of thirty-six minutes per CE report, which produces a total estimate of 2,880,000 minutes per year dedicated to completing CE reports. (capitalization in original). Despite the DSS decreasing the estimated number of CE reports per year by 155,000 CE reports, to meet the requirements of its Modified Contract, Xcelerate Solutions would be required to increase its existing staffing with [redacted] full-time equivalents to support the increase in CE-related work. Thus, under Xcelerate Solutions' Modified Contract, the DSS estimated that it would take Xcelerate Solutions approximately nine times longer to complete a single CE report, and Xcelerate Solutions needed to provide more than [redacted] times the amount of full-time equivalents dedicated to performing CE-related work to complete approximately 155,000 fewer CE reports per year. Such a significant increase in time per CE report and personnel indicates that the CE-related work Xcelerate Solutions was to provide pursuant to the Xcelerate

Solutions' Modified Contract was much more extensive than the CE work Xcelerate Solutions had performed under the unmodified Xcelerate Solutions' Contract.

Additionally, IEA argues that Modification No. P00002 "nearly doubles the price of the contract as awarded, which is strong evidence that the work is outside the scope of the original contract." Taking a concept from the principles applicable to evaluating cardinal changes, although a court "'must look beyond simple arithmetic when assessing a cardinal change claim,'" Golden Mfg. Co. v. United States, 107 Fed. Cl. at 279 (quoting PCL Const. Servs., Inc. v. United States, 47 Fed. Cl. 745, 806 (2000)), "[a]nother factor is whether the modification substantially changes . . . 'costs as between the original contract and modified contract.'" CESC Plaza Ltd. P'ship v. United States, 52 Fed. Cl. at 93 (quoting CCL, Inc. v. United States, 39 Fed. Cl. at 792 (citations omitted); see also Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. at 109 ("Where, as here, the amount of additional work nearly doubles the price of the contract that was awarded, and the nature of the work was so substantially increased that the change provision of the contract had to be deleted to accomplish the modifications, the originally awarded contract has been materially changed." (citation omitted)). The total potential value of the unmodified Xcelerate Solutions' Contract as awarded was $15,322,211.20. Under the second option period of Xcelerate Solutions' Contract, the DSS was to pay Xcelerate Solutions $3,152,544.00. Modification No. P00002 increased the amount the DSS was to compensate Xcelerate Solutions during the second option period by $3,947,827.20 to $7,100,371.20. The increase of $3,947,827.20 was comprised of [redacted] in Contract Line Item Number 2004 for "[i]ncreased Personnel Security Operational support," which IEA is not challenging as being out-of-scope, and [redacted] in Contract Line Item Number 2005 for "DoD Continuous Evaluation Mission support increase/further definition," which IEA is challenging as being out-of-scope.[19] Therefore, the total increase in price that is attributable to the alleged out-of-scope CE work prescribed by Modification No. P00002 during second option period of Xcelerate Solutions' Contract was [redacted]. An increase of [redacted] attributable to the alleged out-of-scope work added by Modification No. P00002 during the second option period of Xcelerate Solutions' Contract, which, as awarded, had a value of $3,152,544.00, represents a price increase of approximately [redacted] percent in the amount the DSS was to compensate Xcelerate Solutions during the second option period of Xcelerate Solutions' Contract.[20] Although the price increase

---

[19] Modification No. P00002 also included individually-priced option periods for "[i]ncreased Personnel Security Operational support" and "DoD Continuous Evaluation Mission support increase/further definition . . . ." Under Xcelerate Solutions' Modified Contract, the DSS could exercise an option period for "[i]ncreased Personnel Security Operational support" during the third option period in Contract Line Item Number 3004 for [redacted] and during the fourth option period in Contract Line Item Number 4004 for [redacted]. The DSS could exercise an option in Contract Line Item Number 3005 for "DoD Continuous Evaluation Mission support increase/further definition" during the third option period for [redacted], as well as an option in Contract Line Item Number 4005 during the fourth option period for [redacted].

[20] The increase of [redacted] percent represents the value of the alleged out-of-scope

of [redacted] percent alone may not be sufficient to demonstrate an out-of-scope modification, in this case, when considered in conjunction with the difference in the type of services Xcelerate Solutions was providing under the Xcelerate Solutions' Modified Contract, the [redacted] percent increase in the price of the second option period is a significant indication that Modification No. P00002 was outside of the scope of Xcelerate Solutions' Contract. See Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. at 109.

Moreover, potential offerors could not have anticipated from the terms of the Solicitation that the resulting contract would be modified to include the administration of the DoD CE program. The Memorandum for Record provides that

[t]his change would not have effected [sic] Contractors at time of quote because the work is not different from what was initially solicited but now better defined or just increased. Contractors could have anticipated that as we gained a better understanding of this new CE mission that we might need to further define our requirement in order to support the greatest performance and success of the winning Contractor.

Section 5.1, titled "Basic Services," in the performance work statement in Part 5 of the Solicitation and Xcelerate Solutions' Contract, stated that the "Vendor shall support duties and processing requests to include . . . other evolving initiatives as related to Continuous Evaluation and the Defense Insider Threat Management Analysis Center." From the language in the Memorandum for Record, however, it is by no means clear, reading the terms of the Solicitation, that an offeror could have anticipated a modification requiring the awardee to assess and validate flagged records, develop the policies, agenda, procedures, strategies, and training programs of the DoD CE program, and develop tracking tools to capture and analyze data related to the efficiency of the DoD CE program as a whole.

IEA further argues that offerors could not have anticipated the issuance of Modification No. P00002 because, at the time the Solicitation was issued, the DSS was not responsible for "the Validation Cell efforts," and there was already a contractor performing "that exact work" under the supervision of another DoD component. The defendant contends that offerors could "have reasonably expected the issuance of Modification P00002" because the Solicitation "advised offerors" that CE was a new mission for the DSS, and Section 5.1 of the Solicitation provided that the awardee would "'support duties and processing requests to include . . . *other evolving initiatives as related to Continuous Evaluation and the Defense Insider Threat Management Analysis Center . . . .'*" (emphasis in original). As the DoD CE program scaled and more government and contractor personnel were enrolled in the DoD CE program, offerors could have anticipated an increase in the number of records flagged by the DoD CE program on an annual basis, which would need to be reviewed and distributed into a risk category. The Solicitation, however, did not indicate to offerors that the awardee's role in

---

work added in Contract Line Item Number 2005 under Modification No. P00002 divided by the value of the second option period as awarded under Xcelerate Solutions' Contract.

the CE program of reviewing, analyzing, distributing, and forwarding flagged records could expand into providing a "knowledge-based analytic capability" for assessing and validating flagged records, the development of the DoD CE program's tracking tools, policies, agendas, procedures, strategies, and training programs, or the gathering and analysis of data related to the efficiency of the entire DoD CE program. Moreover, nothing in the Administrative Record indicates that offerors could have reasonably anticipated that the DoD would realign its CE program, that the work IEA was providing under its Task Order with the WHS would be reassigned to the DSS, and that the work IEA had been providing under IEA's Task Order would be inserted by modification into the contract awarded under the Solicitation. See CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 574 (2004) (concluding that it was "especially true" that potential bidders would not have anticipated a contract modification involving "traditional travel services" when "at the time of contract formation there were already contracts in place for traditional travel services"), recons. denied, 63 Fed. Cl. 459, aff'd, 163 F. App'x 853 (Fed. Cir. 2005).

Although whether potential bidders could have anticipated a modification is judged under an objective standard, see Global Computer Enters., Inc. v. United States, 88 Fed. Cl. at 56, the court notes that, contrary to the defendant's and defendant-intervenor's arguments, the four offerors who responded to the Solicitation did not include in their proposals proposed methods for the "end-to-end processing of the CE alerts for the entire DoD enterprise population." In this regard, defendant argues that Advanced Onion's proposal described "the *entire* Continuous Evaluation mission . . . ." (emphasis in original). In the paragraphs preceding that description, however, Advanced Onion stated:

[redacted]

(emphasis in original). When responding to the terms of the Solicitation which resulted in the unmodified Xcelerate Solutions' Contract, Advanced Onion appears to have discussed IEA's experience with the entire DoD CE program to support its assertion that IEA's "relevant work experience" would permit Advanced Onion to rapidly execute and sort "CE alerts," as required by Section 5.16 of the Solicitation. In the past performance section of its proposal, Advanced Onion also included IEA's Task Order to support its position that it had a capable subcontractor lined up and that it was capable of performing the specific tasks in sections 5.2, 5.3, 5.4, 5.8, 5.10, 5.11, 5.13, 5.14, 5.16, and 5.17 of the Solicitation. Advanced Onion's description of IEA's performance under IEA's Task Order with the WHS, however, does not indicate that Advanced Onion anticipated that the contract awarded under the Solicitation would or could be modified to entail performing end-to-end processing of DoD's CE program, as was contemplated in Modification No. P00002.

Additionally, the proposals of Xcelerate Solutions, Sayres and Associates Corporation, and ANASEC, Inc. did not address "end-to-end processing of CE Alerts for entire DoD enterprise population." Xcelerate Solutions' proposal primarily addressed the [redacted]. Sayres and Associates Corporation's proposal discussed its performance under [redacted], although it did not include a proposed plan addressing how Sayres and Associates Corporation might administer the entire DoD CE program under Section 5.16

of the Solicitation. ANASEC, Inc.'s proposal did note that the DoD CE program was evolving, but its proposal only stated that it [redacted]. (emphasis added). Additionally, none of the four proposals mentioned developing tracking tools to analyze data, policies, agenda, procedures, strategies, and training programs of the DoD CE program. The court, therefore, disagrees with the defendant's position that the offerors' proposals indicated that the offerors anticipated that the contract awarded under the Solicitation could or would be modified to include the end-to-end operation of the DoD CE program.

Thus, by issuing an out-of-scope modification to Xcelerate Solutions' Contract, the DSS violated CICA's requirement of "full and open competition through the use of competitive procedures . . . ." 10 U.S.C. § 2304(a)(1)(A); see, e.g., AT& T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d at 1205; CCL, Inc. v. United States, 39 Fed. Cl. at 791. Accordingly, the DSS' actions were not in accordance with the law. See 5 U.S.C. § 706(2)(A); see also Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. at 110; CCL, Inc. v. United States, 39 Fed. Cl. at 791. Having found that the DSS violated CICA, the court considers whether IEA is entitled to the relief that it seeks.

Initially, IEA requested that this court enter preliminary and permanent injunctions "enjoining Defendant from procuring analytical and policy development support services for the DoD CE Program under Xcelerate's PMSO-I contract, or any other non-competitively-awarded task order or contract . . . until such time as an appropriate competitive procurement is conducted under applicable federal law and regulation and an award made pursuant thereto . . . ." After denying the temporary restraining order on January 3, 2018, the court turns to protestor's request for a permanent injunction.

As discussed above, this court has jurisdiction to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2). In Centech Group, Inc. v. United States, the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d at 1037 (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987))); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); Iron Bow Techs., LLC v. United States, 132 Fed. Cl. 346, 355 (2017); Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218, 232 (2016); MVS USA, Inc. v. United States, 111 Fed. Cl. 639, 649 (2013); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 34 (citing Centech Grp., Inc. v. United States, 554 F.3d at

1037) (citation omitted). Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. 357, 369 (2012) (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See Limco Airepair, Inc. v. United States, 130 Fed. Cl. at 550-51 ("However, while success upon the merits is necessary, it is not sufficient alone for a plaintiff to establish that it is entitled to injunctive relief." (citation omitted)); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing PGBA, LLC v. United States, 389 F.3d at 1228-29). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. [v. United States], 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. Id.

Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010); see also Wallace Asset Mgmt., LLC v. United States, 125 Fed. Cl. 718, 727 (2016); Amidon, Inc. v. United States, 124 Fed. Cl. 517, 522 (2015).

In the above-captioned bid protest, IEA has established success on the merits by demonstrating that the DSS acted contrary to law when the DSS issued an out-of-scope modification to Xcelerate Solutions' Contract. Regarding the second factor, whether or not the protestor will suffer irreparable harm if injunctive relief is not granted, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 582 (2013) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)); see also Iron Bow Techs., LLC v. United States, 132 Fed. Cl. at 358 (citing Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 78, recons. denied, 77 Fed. Cl. 81 (2007); Rush Constr., Inc. v. United States, 117 Fed. Cl. 85, 101 (2014); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494; Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494 (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390-91 (2010); Serco, Inc. v. United States, 81 Fed. Cl. at 501-02; and Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002)); see also Veterans Contracting Grp., Inc. v. United States, 133 Fed. Cl. 613, 623 (2017) ("The '[d]enial of the opportunity to compete for a contract can constitute irreparable harm.'" (alteration in original) (quoting Miles Constr., LLC v. United States, 108 Fed. Cl. 792, 806 (2013) (citing Elec. On–Ramp, Inc. v. United States, 104 Fed. Cl. 151, 169 (2012); NetStar–1 Gov't Consulting, Inc. v. United States, 101 Fed. Cl. 511, 530 (2011), aff'd, 473 F. App'x 902 (Fed. Cir. 2012))); Remington Arms Co., LLC v. United States, 126 Fed. Cl. at 232 (explaining that the loss

of potential work and profits from a government contract constitutes irreparable harm); BINL, Inc. v. United States, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is established by a lost opportunity to fairly compete."); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. at 245 (citing several cases); Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'" (citations omitted)), motion to amend denied, 94 Fed. Cl. 553 (2010). The loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. at 744 (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.")); see also KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 363 (2015) (agreeing with protestor that the lost opportunity to compete for a future contract will cause irreparable harm); Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 828. According to a judge of this court, "[t]he court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." BINL, Inc. v. United States, 106 Fed. Cl. at 49 (quoting Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012) (citing BayFirst Sols., LLC v. United States, 102 Fed. Cl. 677, 696 (2012))); see also MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 552-53 (2011).

IEA argues that its lost opportunity to compete and continued loss of its "existing team of experienced Personnel Security Analysts" constitutes irreparable harm. The defendant, however, contends that IEA's loss of employees is not irreparable because IEA does not assert its lost employees are "irreplaceable," but only that the lost employees cannot be replaced within a reasonable period of time. The defendant also asserts that IEA's loss "is purely monetary and thereby *not* irreparable." (emphasis in original). Nevertheless, if performance of Contract Line Item Numbers 2005, 3005, and 4005 in Modification No. P00002 of Xcelerate Solutions' Modified Contract is not enjoined, IEA will suffer irreparable harm because IEA will have lost an opportunity to compete for the DoD CE program work contained in Contract Item Line Numbers 2005, 3005, and 4005 in Modification No. P00002. See Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. at 110 ("In this case, Cardinal lost the opportunity to compete on a level playing field for the contracts awarded to Navales and Choe. In addition, it was excluded from this bidding process because of the government's violation of CICA. As a consequence, Cardinal has shown irreparable injury sufficient to satisfy the requirement for a permanent injunction.").

According to IEA, the balance of hardships weighs in its favor because "there would be no hardship to the Agency if it were unable to authorize (and/or continue) performance" of Contract Line Item Numbers 2005, 3005, and 4005 in Modification No. P00002 of Xcelerate Solutions' Modified Contract because "the Government could continue obtaining the services under IEA's existing task order at approximately the same price" and "the Government could compete the work," which "would result in the best value for the Government." The defendant contends that "[e]ven assuming DSS could purchase the services" under IEA's Task Order with the WHS, which is a "point we [the

defendant] do not concede," the "DSS should not have to move backwards by using a contract vehicle (the WHS Contract) that DSS [a different organization within the DoD] contract personnel cannot administer." The defendant also asserts that obtaining the DoD CE program services under IEA's Task Order would "defy" the DoD's realignment of its CE program. Therefore, if enjoined, the defendant alleges that the government will have to either "(1) go without certain Continuous Evaluation services (while an expedited 'final' procurement is performed), or (2) execute an expedited short-term procurement." According to the defendant, the "DSS's first option (forego services) is an obvious national security issue—failure to perform Continuous Evaluation tasks could result in personnel maintaining their clearance despite derogatory information having been identified." The defendant also claims its second option of conducting "an expedited competition for a short-term 'bridge' contract would result in some gap in Continuous Evaluation services . . . ."

The declaration which the defendant relies upon to support its claim that forgoing CE services for any period of time would be an "obvious national security issue" is a declaration signed by Ashley D. Maddox, who states in her declaration that she is employed by the DSS "as a Supervisory Contract Specialist, serving as a Contracting Officer."[21] In her declaration, Ms. Maddox states:

> DSS's first option (forego services) would be a tremendous hardship because it would cause a national security issue in that the failure to timely complete Continuous Evaluation tasks could result in personnel maintaining their clearance despite derogatory information having been identified.

---

[21] In its motion for judgment on the Administrative Record and in its reply, the defendant did not cite to the Administrative Record when discussing the "obvious national security issue" the DSS would be presented with if this court were to enjoin performance of Contract Line Item Numbers 2005, 3005, and 4005 in Modification No. P00002 of Xcelerate Solutions' Contract. Although APA review is to be applied to an agency's decision based on the record the agency presents to the court, the court may supplement the administrative record when omission of the supplemental material precludes effective judicial review. See AugustaWestland N. Am., Inc. v. United States, 880 F.3d 1326, 1331-32 (Fed. Cir. 2018); see also Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1380. In this case, the defendant submitted the declaration signed by Ms. Maddox to the court as an attachment to its reply to its motion for judgment on the Administrative Record. The declaration signed by Ms. Maddox is the only document presented by the defendant which suggests that enjoining the DoD CE program for any period of time could be a national security issue. Because the Administrative Record did not contain any information regarding the impact an injunction would have on national security, omission of the declaration signed by Ms. Maddox would have precluded the court from effectively considering whether a permanent injunction is warranted in the above-captioned protest. Therefore, the court permitted the declaration signed by Ms. Maddox to be considered by the parties and the court.

DSS's second option (conduct a short-term procurement, or "bridge" contract) would be a tremendous hardship because it would also cause a gap (albeit, likely shorter) in Continuous Evaluation tasks that could result in personnel maintaining their clearance despite derogatory information having been identified. DSS's second option has the additional negative result that DSS will have to perform three contract actions for one set of services (modification P00002, interim contract, final contract).

The declaration signed by Ms. Maddox states only that the first option would be a tremendous hardship, and without much by the way of specifics, not a national security impact, and that if the second option of a bridge contract or a short-term procurement is to be used would be a tremendous hardship and "could result in personnel maintaining their clearance despite derogatory information having been identified," again with not much by way of specifics. In this instance, the defendant, although expressing concern, did not invoke a national security claim or argue very forcefully that dire consequences would occur if an injunction was issued or as to a national security impact. IEA's counsel of record, however, indicated at the January 18, 2018 oral argument, IEA would be willing to perform a bridge contract while the DSS competed the out-of-scope work contained in Modification No. P00002 of Xcelerate Solutions' Contract with the DSS. Consequently, the balance of the hardships incurred if Contract Line Item Number 2005, 3005, and 4005 in Modification No. P00002 of Xcelerate Solutions' Contract were enjoined weighs in favor of IEA.

Regarding the public interest factor, "'[t]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003)); see also Torres Advanced Enter. Sols., LLC v. United States, 133 Fed. Cl. 496, 534 (2017); Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 289 (2013); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.") (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. 589, 608 (2014); BINL, Inc. v. United States, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."). An important public interest is served through conducting "honest, open, and fair competition" under the FAR, because such competition improves the overall value delivered to the government in the long term. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495. "[T]he public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. 124, 147 (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 193 (2015)), appeal dismissed, 691 F. App'x 906 (Fed. Cir. 2016).

IEA contends that awarding a permanent injunction serves the public interest because the integrity of the federal procurement process will be preserved if the DSS is not permitted to continue obtaining work related to the DoD CE program under Modification No. P00002. Additionally, according to IEA, "an injunction that requires re-solicitation may result in a lower cost to taxpayers for the work." Conversely, the defendant asserts that the public interest would be furthered if the court did not issue an injunction because even temporarily halting the DoD CE program would allow reported derogatory information to go unaddressed. Even though Advanced Onion was not awarded the contract issued under the Solicitation, the defendant also alleges that the integrity of the procurement process would not be harmed because "IEA, through the prime contractor Advanced Onion, had the opportunity to compete for the PSMO-I Contract that DSS later modified."

In this protest, the integrity of the federal procurement process is served by enjoining the DSS' out-of-scope modification. Enjoining Contract Line Item Numbers 2005, 3005, and 4005 in Modification No. P00002 requires the DSS to satisfy CICA's full and open requirements, as the DSS should have and could have done when it originally sought to obtain the out-of-scope work prescribed by Contract Line Item Numbers 2005, 3005, and 4005 from Xcelerate Solutions. In this instance, an injunction will promote the integrity of the procurement process by holding the government accountable when it takes actions that are contrary to law and may result in cost-savings for the government. As discussed above, Ms. Maddox's declaration is insufficient in the case of this modification to outweigh the public's interest in favor of a fair and open competition. Consequently, the four factors for injunctive relief weigh in favor of granting a permanent injunction enjoining the performance of Contract Line Item Numbers 2005, 3005, and 4005 in Modification No. P00002 to the Xcelerate Solutions' Contract.

Finally, IEA requested in its complaint that this court "enter an order directing Defendant to acquire analytical and policy development support for the DoD CE Program through the previously competed and competitively awarded task order held by IEA until such time as Defendant makes another competitive award of a contract for such services as required under applicable federal law and regulation . . . ." IEA does not address its request in its motion for judgment on the Administrative Record. Defendant argues that, while the court may enjoin Modification No. P00002, the court may not "enjoin the agency from taking lawful actions in the future." Although the court has enjoined performance of the out-of-scope work in Modification No. P00002, the court does not instruct DSS to extend IEA's Task Order. See ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. at 79; CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 559 (2000) (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d at 1153; and Scanwell Lab., Inc. v. Shaffer, 424 F.2d at 869).

## CONCLUSION

Accordingly, because IEA has demonstrated success on the merits and the balance of the equitable factors weigh in IEA's favor, the DSS is permanently enjoined

from obtaining "DoD Continuous Evaluation Mission support increase/further definition in accordance with the updated Performance Work Statement Part 5, executed in P00002" under Contract Line Item Numbers 2005, 3005, and 4005 in Modification No. P00002 to Xcelerate Solutions' Contract, Contract No. HS0021-16-C-0006. Protestor's motion for judgment on the Administrative Record is **GRANTED**. Defendant's motion to dismiss is **DENIED**. Defendant's motion for judgment on the Administrative Record is **DENIED**. Defendant-intervenor's motion for judgment on the Administrative Record is **DENIED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

   **IT IS SO ORDERED.**

             s/Marian Blank Horn
             **MARIAN BLANK HORN**
                **Judge**